**ALHAMBRA MOTOR PARTS et al.,**
**Petitioners,**

**v.**

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 17222.**

United States Court of Appeals
Ninth Circuit.

Oct. 9, 1962.

H. J. Gross and Harris K. Lyle, Van Nuys, Cal., for appellant.

James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Francis C. Mayer, and Lester A. Klaus, Attys., Federal Trade Commission, Washington, D. C., for appellee.

Before BARNES, HAMLEY and BROWNING, Circuit Judges.

HAMLEY, Circuit Judge.

This matter is before us on a petition to review a cease and desist order issued by the Federal Trade Commission. The petitioners, who were the respondents in the agency proceeding, are Southern California Jobbers, Inc., (SCJ), a cooperative corporation, and its fifty-nine jobber-members.

The Commission order required them to cease and desist the practice of inducing and receiving price discriminations in violation of section 2(f) of the Clayton Act, as amended by the Robinson-Patman Act (Act), 15 U.S.C.A. § 13(f).

SCJ, organized under the laws of California and having its principal place of business in Los Angeles, owns and operates a warehouse and a fleet of trucks and has twenty-five employees. The jobber-members, each of whom owns one share of stock of SCJ, are engaged in the wholesale distribution of automotive parts, accessories and supplies in the Los Angeles area. They purchase the described commodities in substantial quantities and resell them, in competition with each other and with independent jobbers, to garages, service stations, car dealers, and fleet owners.

SCJ has in the past engaged in two quite distinct types of operations. These are referred to in the record as "brokerage" and "warehouse" operations. In the brokerage operation individual jobber-members order commodities from the manufacturers or suppliers on forms provided by SCJ.[1] These orders are sometimes sent directly to the manufacturers and sometimes to the SCJ office for consolidation with orders from other jobber-members before transmittal to the manufacturers. The manufacturers ei-ther "drop-ship" the merchandise direct to the ordering jobber-members or allow the SCJ delivery service to make the deliveries. The brokerage operation was utilized in connection with twenty-nine different lines of commodities not stocked by the SCJ warehouse.

The manufacturers bill SCJ for the merchandise ordered and delivered in the manner described above. Each month the manufacturers receive payment from SCJ for the aggregate purchases made in this way. In making these payments SCJ deducts from the manufacturers' catalog prices a two percent cash discount and a quantity discount calculated by aggregating all such orders filled during the preceding month. Total brokerage purchases increased from $1,595,000 in 1955 to $1,880,000 in 1956, and then decreased to $1,807,000 in 1957, and $1,367,000 in 1958.

SCJ has engaged in its warehouse operation since at least 1955. The warehouse is operated solely for the benefit of its jobber-members and no goods are sold or distributed therefrom to non-group jobbers. However, any jobber in the Los Angeles area who desires to become a member of SCJ is permitted to do so. Total warehouse purchases increased from $297,800 in 1955 to $1,762,346 in 1958. For the first ten months of 1959, warehouse purchases were $2,013,610.

In its warehouse operation SCJ orders and stocks forty lines of merchandise in anticipation of future orders from individual jobber-members. On purchases for its warehouse stock SCJ receives from the manufacturer a two percent cash discount and a redistribution discount ranging from twenty percent to twenty-eight percent.

A redistribution discount is a functional discount allowed by manufacturers to all warehouse distributors for warehousing a minimum stock of the manufacturer's products, and for reselling those products to jobbers. These discounts are allowed to SCJ pursuant to

[1]. We will herein use the term manufacturers to include both manufacturers and suppliers.

contracts entered into between the co-operative and individual manufacturers. The redistribution discount allowed to SCJ on its warehouse purchases is the same as that allowed to independent warehouse distributors.

In selecting lines to be handled by the SCJ warehouse, representatives of competing manufacturers are first allowed to submit prices and appear before the cooperative's merchandising committee. This committee recommends a certain line to the board of directors which then canvasses the membership. If the members favor the committee recommendation, the board approves the line.

Most jobber-members buy from SCJ, and sell to their customers, the manufacturers' lines accepted by the group and stocked in the warehouse. This, however, is not a rigid requirement and members are free to handle competitive lines. When a manufacturer's line is accepted notice is sent to all members in the form of a "deal book," giving full particulars as to the contract terms agreed upon.

Each jobber-member, upon joining SCJ, contributes $4,450.00, of which $800.00 is a capital stock contribution. The remainder is deposited in a merchandise guaranty revolving fund the purpose of which is to insure prompt payment of manufacturers' invoices, thus earning the two percent cash discount.

Each jobber-member receives from SCJ a yearly merchandise statement containing a report of "retained impounds." An "impound" is the difference between the jobber prices, at which the members are originally billed, and the prices which SCJ pays to the manufacturers. This difference is accounted for by the cash and volume discounts allowed by manufacturers on the brokerage operation and the cash and redistribution discounts allowed by manufacturers on the warehouse operation.

Each jobber-member shares in the retained impounds and in the cost of operating SCJ, on the basis of individual purchases (from the manufacturers in the case of the brokerage operation, and from SCJ in the case of the warehouse operation) as compared to total purchases made through or from SCJ by all jobber-members. Delivery charges are separately billed. Each member's allocated portion of net impounds is not actually paid to it but is applied as a credit to reduce indebtedness to SCJ on past-purchased merchandise.

Section 2(f) of the Act, 15 U.S.C.A. § 13(f), provides that it shall be unlawful for any person engaged in commerce, in the course of such commerce knowingly to induce or receive a discrimination in price which is prohibited by that section. The discriminations in price which are thus forbidden to be induced or received are those which are prohibited under section 2(a) of the Act, 15 U.S. C.A. § 13(a), quoted in the margin.[2]

Section 2(a) contains a proviso to the effect that nothing contained in that section " * * * shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered (subject to a further proviso not here applicable) * * *."

2. Section 2(a) reads in part:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: * * *."

The Examiner and the Commission found, with respect to both the brokerage and warehouse operations, that petitioners had knowingly induced and received price discriminations prohibited by section 2(a). It was found that, as a result, the prices paid by jobber-members were substantially lower than the prices paid by competing non-group jobbers, and that the latter were injured within the meaning of the Act. It was also found that petitioners knew or should have known that the substantially lower prices, induced and received by them, were not within any of the sellers' defenses provided by the Act. With regard to all such brokerage and warehouse operations whereby income was received by jobber-members as a result of price discounts granted to SCJ, petitioners were ordered to cease and desist.

With respect to the brokerage operation, the Commission's order finds support in recent decisions in the Fifth and Second Circuits. See Mid-South Distributors v. Federal Trade Commission, 5 Cir., 287 F.2d 512; American Motor Specialties Co. v. Federal Trade Commission, 2 Cir., 278 F.2d 225. On this review petitioners concede that their brokerage business conducted through SCJ, as described above, is in violation of the applicable provisions of the Act, as construed in these decisions. Accordingly, petitioners do not seek a review of the Commission order insofar as it is directed to the brokerage phase of their operations.

We are therefore only concerned, on this review, with the findings made, conclusions reached, and order entered with regard to the warehouse operation of SCJ and its members, as described above.

The Commission staff made no effort to prove, nor did the Examiner or Commission find, that the redistribution discount allowed on the SCJ warehouse operation effectuated a price differential in favor of SCJ as compared to other warehouse distributors. It necessarily follows that there could not be, and was not, a finding that the allowance of such discount to SCJ tended to affect competition between it and other warehouse distributors, or tended to create a monopoly with regard to warehouse distribution.

What the Commission staff undertook to prove was that: (1) the jobber-members, rather than SCJ, were the buyers from the manufacturers of the commodities handled in the warehouse operation and were accordingly the recipients of the redistribution discount; (2) such discount effectuated a price differential in favor of the jobber-members, as compared to independent jobbers; (3) this price differential tended to lessen competition and to injure, destroy, or prevent competition between the jobber-members and independent jobbers; and (4) the jobber-members, knowingly induced and received such price differential.

The Examiner so found, and concluded therefrom that this price differential was a prohibited price discrimination within the meaning of section 2(a) of the Act, and that in inducing and receiving this prohibited price discrimination, the jobber-members had violated section 2(f) of the Act. The Commission concurred in these findings and conclusions.

If it be assumed that the Examiner and the Commission correctly decided these four issues, this still might not be dispositive of the case if the price differential was cost justified within the meaning of the first proviso of section 2(a). In that event petitioners would have a complete defense unless the Commission is able to establish that such differential is not available on proportionally equal terms to independent jobbers competing with the jobber-members.[3]

3. See section 2(d) of the Act, which reads as follows:

"(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products

In answer to the Commission's complaint petitioners advanced the defense of cost justification.[4] Such a defense would not have been necessary if SCJ rather than the jobber-members had been found to be the buyer from the manufacturers.[5] But since the Examiner held that the jobber-members were the buyers and that their receipt of the price differential affected competition between them and independent jobbers, he was required to deal with this defense in order to dispose of the case.

The only reference to this defense in the Examiner's decision is the statement, quoted in the margin, contained in paragraph 6 of his conclusions.[6] This is not a clear-cut finding on the issue. It was made, not with specific reference to the defense of cost justification, but in dealing with the different question of whether jobber-members "knowingly" induced or received price discriminations. In addition, the Examiner here seemed to be primarily concerned with volume discounts, which are not in question in this review proceeding.

Moreover, this statement, if regarded as a finding, appears to be predicated on the idea that in order to be cost justified, the pro rata part of the price differential received by individual jobber-members must be offset by some cost-saving service performed by them individually for the manufacturers, apart from any service rendered for the manufacturers by the SCJ warehouse operation. This is the only possible explanation for the Examiner's observation, in the course of the quoted statement, that the jobber-members "knew that *no* cost justification could be maintained by the sellers since *no* difference in the cost of manufacture, sale, or delivery was involved." (Emphasis supplied.)

As will be indicated later in this opinion, there is a great deal of evidence indicating that the warehouse operation of SCJ constituted a functional equivalent of the service rendered for manufacturers by other warehouse distributors, and constituted a function which the manufacturers otherwise would have had to provide at their own expense. We fail to see the logic in holding that

---

or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

4. In paragraph 3 of their answer, petitioners alleged:
"* * * respondent, Southern California Jobbers, Inc. is a legitimate co-operative business organization, conducting a bona fide business operation and rendering valuable services to its suppliers and to its member customers in connection with the purchase, transportation, warehousing, advertising, selling, educating purchasers in the use of new products, paying all purchase invoices directly to the suppliers, breaking bulk, facilitating and expediting delivery of merchandise to the various jobbers, saving in volume and expense of processing orders and invoices, and that said services and others, as will appear, enable the suppliers to save large sums of money, the exact extent of which is unknown to respondents but which respondents allege upon information and belief to be more

than sufficient in amount to make due allowance for any price differential which may be found to have been granted; * * *."

5. In that event, since it was neither alleged, proved nor found that SCJ received a price discrimination as compared to competing warehouse distributors, no defense would have been required.

6. "6. The respondent jobber members know that the rebates allowed were based not on the quantities or other factors involved in a particular sale, and not upon quantities sold by them to other jobbers, but rather upon the combined dollar amount of all *sales to the respondent jobber members through the group organization* and bear relationship to factors other than the actual costs of production and delivery. The respondent jobbers were successful operators in a highly competitive market and knew the facts of life so far as the automotive parts market was concerned and knew that no cost justification could be maintained by the sellers since no difference in the cost of manufacture, sale or delivery was involved * * *." (Emphasis added.)

SCJ must not be regarded as the buyer but only as the agent of jobber-members who are the actual recipients of the price differential, and in refusing, at the same time, to credit the latter with the cost-saving function which their asserted agent, SCJ, performs for the manufacturers.

In its brief in this court the Commission asserts:

" * * * Petitioners presented no evidence showing their activities provided cost savings [25] to the suppliers, or benefited anyone other than themselves * * * [Footnote 25. Indeed, in sharing the expenses of warehousing to them as buyers, petitioners were able to demonstrate a maximum merchandise expense to purchases of only 1.13% for any one calendar year between 1940 and 1950. See apdx. 26; Cx 58D.]."

■ Besides being factually inaccurate, since petitioners presented a great deal of evidence on this point, the quoted assertion indicates that the Commission regarded petitioners as having the burden of coming forward with evidence that the price differential was cost justified. In a section 2(f) case, however, the burden is upon the Commission. Automatic Canteen Co. v. Federal Trade Commission, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454.[7]

The record reveals, without dispute, that SCJ, whether considered as an independent entity and the buyer from the manufacturers, or only as the agent of jobber-members who were the buyers, performed a warehouse and distribution service which saved money for the manufacturers.

The SCJ warehouse operation has been carried on since 1955. In 1957, prior to the filing of the complaint in this case SCJ moved into its new warehouse which cost $110,000, and contains fourteen thousand square feet of floor space. Reference has previously been made to SCJ's fleet of trucks and the number of employees on its payroll. Some of these trucks and employees, however, were utilized in SCJ's properly banned brokerage business.

In its own name SCJ ordered commodities in large quantities from the manufacturers. It accepted financial responsibility for payment, took title in its own name, and paid from its own account.

Price sheets and catalogs were furnished by SCJ, and jobber-members were encouraged to purchase lines stocked in its warehouse. SCJ sold to jobber-members on the same basis that an independent warehouse distributor sells to independent jobbers. Orders were received from jobber-members from day to day. SCJ filled these orders by taking merchandise from the warehouse stock, after which it was packaged and delivered to the jobber-members who placed the orders.

If the particular merchandise ordered was not in stock a warehouse truck was sent to obtain it from an independent warehouse distributor, in which event SCJ was allowed no redistribution discount; or from the manufacturer, in which case such discount was allowed. When delivery had been made, SCJ billed the jobber-members who received the merchandise at the manufacturer's list price for jobbers.

All of the service performed by SCJ as described above, is service which jobbers do not ordinarily provide and which the manufacturers would otherwise have to provide themselves, or have provided by other warehouse distributors to whom the manufacturers would allow a redistribution discount. The owner of a competing warehouse expressed the view at the Commission hearing that SCJ functioned as a warehouse distributor. All the manufacturers' representatives who

7. Footnote 25, which is a part of the quoted statement from the Commission's brief, seems to indicate that the Commission also erroneously believed that the cost to petitioners of rendering the service to the manufacturers is relevant in determining whether the price differential was cost justified.

testified at the hearing stated that SCJ met their usual criteria for the redistribution discount.

It is true that the evidence reviewed above may not establish with sufficient precision to warrant a finding to that effect, that such cost savings to the manufacturers were equal to the discount allowed. But since it is established in the evidence that there were these differences in the methods by which manufacturers sold to jobber-members, as compared to independent jobbers, the burden was on the Commission to show that the cost saving could not be commensurate with the price differential.[8]

Having found and concluded, albeit in a manner and on a record which renders the same suspect, that the price discrimination was not cost justified, the Examiner did not reach the question of whether the cost-justification defense is inapplicable because the differential is not available on proportionally equal terms to independent jobbers.[9]

If we were to conclude that the Commission erred in holding that the jobber-members, and not SCJ, were the buyers from the manufacturers and therefore the recipients of the price differential, this would require us to vacate the order and dismiss the proceedings. On the other hand if we were to hold that the Commission ruling is correct in this regard we would, for the reasons discussed above, be required to remand the proceedings to the Commission for further consideration of the cost-justification issue. In that event it is conceivable that the Commission would find the cost-justification defense applicable, thereby calling for Commission dismissal of the proceedings.[10]

In this posture of the case it appears to us that the appropriate action for us to take is to remand the proceeding at this time for further consideration of the cost-justification defense, and without first undertaking to decide the issue as to whether SCJ, or the jobber-members, are the buyers from the manufacturers, and the recipient of the price differential. The latter issue appears to be one of first impression insofar as court decisions are concerned.[11] The resolution of that issue calls for the consideration of a perplexing interplay of facts and legal principles, all of which

8. As the Supreme Court said in Automatic Canteen at page 80, 73 S.Ct. 1027, 1028: " * * * The Commission need only show, to establish its prima facie case, that the buyer knew that the methods by which he was served and quantities in which he purchased were the same as in the case of his competitor. If the methods or quantities differ, the Commission must only show that such differences could not give rise to sufficient savings in the cost of manufacture, sale or delivery to justify the price differential, and that the buyer, knowing these were the only differences, should have known that they could not give rise to sufficient cost savings. * * * "

9. This possible barrier to the assertion of the cost-justification defense is mentioned above opposite footnote reference 3.

10. Or, on further review, a Commission order again rejecting the cost-justification defense, might be held to be erroneous, thereby requiring court dismissal of the proceeding.

11. None of the cases cited in the briefs dealt with this question as related to a cooperative whose members received pro rata distribution, according to their respective purchases, of the net proceeds of a redistribution discount allowed by manufacturers to the cooperative which conducted a cost-saving warehouse and redistribution service.

In E. Edelmann & Co. v. Federal Trade Commission, 7 Cir., 239 F.2d 152, the Examiner found that one of the six cooperative buying groups there involved maintained neither warehouse nor stock of the manufacturer's products and that "the record is silent as to the other five." Southgate Brokerage Co. v. Federal Trade Commission, 4 Cir., 150 F.2d 607, did not involve a cooperative buying group and arose under section 2(c) of the Act, relating to brokerage. In American Motor Specialties Co. v. Federal Trade Commission, 2 Cir., 278 F.2d 225, the question was whether members of buying groups which received pro rata volume discounts had received unlawful price discriminations. These groups rendered no warehouse redistribution service.

would be of no avail if cost justification ultimately turns out to be a good defense.[12]

Moreover, we are frank to say that the way in which the issue as to whether SCJ or the jobber-members are the buyers was dealt with in the agency proceedings, and in the Commission's brief on review, presents a most unsatisfactory basis for a ruling thereon by this court. This is due partly to the fact that in the Commission proceeding the brokerage aspect of the case, not here in question, was dealt with as the matter of main concern.[13]

The warehouse operation was characterized in the record as an "occasional" method of doing business of comparatively "recent" origin. It was in effect regarded by the Examiner as virtually ancillary to the brokerage business and as a means of assisting the members in obtaining rebates principally through the brokerage operation.

For this and perhaps other reasons, there are neither findings, conclusions nor discussion by the Examiner or the Commission regarding the economic and legal significance of the facts: (1) that this group buying organization performed substantially the same economic function as other warehouse distributors who received the same functional discount; (2) that the performance of this function resulted in cost savings to the sellers; and (3) that the distribution to the jobber-members of the net gain from the functional discounts in accordance with the volume of their purchases was within the apparent protection of section 4 of the Act, 15 U.S.C.A. § 13b.[14]

These matters lie in the area in which the Commission's accumulated experience should provide the helpful guidance which Congress expected the Commission to furnish to the courts. They are obviously relevant to the proper disposition of the case. Adequate analysis,

12. In holding that the corporate identity of SCJ, and the fact that it rather than the jobber-members entered into contracts of purchase with the manufacturers, should be disregarded and the jobber-members should be considered to be the actual buyers from the manufacturers, the Examiner relied on these circumstances: (1) SCJ is owned by the jobber-members; (2) SCJ deals only with jobber-members and operates in a manner expressly designed to meet only their needs; and (3) SCJ distributes to its jobber-members, in proportion to their individual purchases of warehouse stock, all proceeds of the redistribution allowance received from manufacturers, after deduction of operating expenses. .

Petitioners argue, on the other hand, that in determining whether SCJ or its jobber-members are the buyers from the manufacturers, the circumstances referred to above do not overcome the fact that SCJ is a separate entity, and is the contract purchaser of the commodities in question.

As additional support for their view that SCJ is the buyer, petitioners point to these factors: (1) SCJ makes its purchases of warehouse stock, not to fill orders already received, but in anticipation of future orders from jobber-members which the latter are not required to place; (2) SCJ provides a bona fide

warehousing and distribution service of value to manufacturers of a kind which individual jobbers do not ordinarily provide and which manufacturers would otherwise have to provide at their expenses; (3) the relationship between SCJ and its jobber-members does not prevent SCJ from rendering a cost-saving function for manufacturers commensurate with that rendered by independent warehouse distributors who receive a like redistribution discount; and (4) in view of section 4 of the Act, 15 U.S.C.A. § 13b, relating to cooperative associations, the fact that SCJ returns to its members the net earnings resulting from the warehouse distribution operation does not prevent SCJ from being regarded as the buyer from the manufacturers.

13. At the time of the hearings before the Examiner there were no court decisions holding the brokerage business unlawful and petitioners vigorously defended that operation.

14. Section 4 reads as follows:
"Nothing in this Act shall prevent a cooperative association from returning to its members, producers, or consumers the whole, or any part of, the net earnings or surplus resulting from its trading operations, in proportion to their purchases or sales from, to, or through the association."

findings and conclusions with respect to these matters seem to us to be essential to a proper review of the Commission's order. As stated by the Supreme Court in Securities and Exchange Commission v. Chenery, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626: "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." [15]

Nor has the indicated deficiency in the Commission's decision been cured by what we find in its brief on review. It has already been stated that none of the court decisions upon which the Commission relies, is solidly in point on the issue under discussion. The Commission cannot be expected to produce decisions which do not exist. But it ought not to ask us to rule in its favor on the strength of court decisions which are clearly distinguishable.[16]

In its brief in this court, the Commission has dwelled at length on the illegality of the so-called SCJ brokerage operation and the "volume" discount allowed thereon. More pages, by far, are devoted to this subject than to the validity of the warehouse redistribution discount.[17]

It seems almost inexplicable that the Commission would, on this review, give such emphasis to the matter of volume discounts on the brokerage operation, when it has known from the time the petition herein was filed that there is no such issue before us. Our reaction might be different if the SCJ warehouse operation was shown to be only a minor supplement to a brokerage operation which SCJ seeks to defend, but this is not the case.

In view of what is said above, and inasmuch as the cause must in any event be remanded for further consideration of the cost-justification issue, we conclude that on such remand the issue of the status of SCJ as the buyer and direct recipient of the price differential, should be further considered.

Nothing said in this opinion is intended to question in any way the Commission's order requiring petitioners to cease and desist the inducing or receiving of volume or cash discounts to SCJ on the so-called brokerage operation. The evidence indicates that this SCJ operation has been dwindling since 1958 and of course must now entirely cease, insofar as the collection of a discount thereon is concerned.

Insofar as the Commission order under review relates to the so-called brokerage operation, the order is affirmed and a decree enforcing the same may be entered. Insofar as the Commission order relates to the so-called warehouse redistribution discount, the order is set aside and the cause is remanded for further proceedings consistent with this opinion.

15. See also, Davis, Administrative Law Treatise (1958), Volume 2, § 16.13, pp. 485–486.

16. Concerning the American Motor Specialties case, where no warehouse operation was involved, it is asserted in the Commission brief that the decision is "fully dispositive of all the issues in the present proceeding * * *."

17. At one point in its brief on this review the Commission states that complaints in thirteen proceedings instituted by the Commission involving asserted section 2 (f) violations by groups of automotive jobbers alleged violations "similar to the alleged violation in the instant case." Of the eight proceedings so listed which have been reported and are available for our examination, not a single one, with the exception of the instant proceeding involved a warehouse operation or a redistribution discount. Only a discount for so-called brokerage service was involved. See Warehouse Distributors, Inc. et al., 55 F.T.C. 188 (1958); Midwest Warehouse Distributors, Inc. et al., 55 F.T.C. 414 (1958); Hunt-Marquardt, Inc. et al., 55 F.T.C. 910 (1958); Borden-Aicklen Auto Supply Co., Inc. et al., 55 F.T.C. 1279 (1959); D & N Auto Parts Co., Inc. et al., 55 F.T.C. 1279 (1959); American Motor Specialties Co., Inc. et al., 55 F.T.C. 1430 (1959); Allbrights et al., 55 F.T.C. 1556 (1959).