Don PIERCE, et al., Plaintiffs,

v.

COMMERCIAL WAREHOUSE, et al., Defendants.

No. 86–203–CIV–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

May 6, 1988.

Britt Whitaker, Joseph R. Fritz, Tampa, Fla., for plaintiffs.

Charles W. Pittman, MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for defendant Federal–Mogul Corp.

John T. Cusack, Gardner, Carton & Douglas, Chicago, Ill., for defendant Sealed Power Corp.

Michael A. Fogarty, J. Kevin Carey, Glenn, Rasmussen, Fogarty, Merryday & Russo, Tampa, Fla., Michael M. Eaton, Marc L. Fleischaker, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for defendant Fel Pro, Inc.

Robert R. Vawter, Jr., Shackelford, Farrior, Stallings & Evans, Tampa, Fla., for defendant Allied Corp.

Paul A. Saad, Sylvia H. Walbolt, Don Schmidt, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, Fla., for defendants Parts & Equipment Distributors, Inc. and Commercial Warehouse Div., Thompson Automotive Parts.

James F. Kavanaugh, David Rosenblatt, Burns & Levinson, Boston, Mass., Michael Addison, Charles F. Ketchey, Jr., Addison, Ketchey & Horan, P.A., Tampa, Fla., for defendant Arrow Automotive Industries, Inc.

John C. Vogt, Jr., Tampa, Fla., for defendant Parts & Equipment Distributors, Inc.

R.L. Edwards, James W. Middleton, Kimbrell & Hamann, Miami, Fla., for defendant Gates Rubber Co., Inc.

Keith E. Rounsaville, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., for defendant EMB Brake and Automotive Supply, Ins.

R. Frederick Melin, Bradley & Melin, Tampa, Fla., for defendant Tampa Brake & Supply Co., Inc.

Thomas D. Yannucci, Jeffrey A. Rosen, Kirkland & Ellis, Washington, D.C., for defendant Federal–Mogul Corp.

C. Wade Yeakle, III, Yeakle, Janssen & Watson, P.A., St. Petersburg, Fla., for defendant United Equipment Sales, Inc.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This cause is before the Court on the following:

Plaintiffs' motion for partial summary judgment, filed on May 22, 1987

Request for Oral Argument, filed on May 22, 1987

Warehouse Distributor Defendants' motion for summary judgment, filed on May 22, 1987

Brief of Manufacturer Defendants in support of consolidated motion for summary judgment, filed on May 28, 1987

Plaintiffs' request for oral argument, filed on June 26, 1987

Plaintiffs' response to Defendants' motion for summary judgment, filed on June 26, 1987

Warehouse Distributor Defendants' joint brief in opposition to Plaintiffs' motion for partial summary judgment, filed on June 30, 1987

Manufacturer Defendants' reply brief in support of motion for summary judgment, filed on July 7, 1987

Warehouse Distributor Defendants' reply memo in support of summary judgment, filed on July 8, 1987

FACTS:

The Plaintiffs in this case are Dano Parts Corporation, Cal's Auto Supply, Tampa Engines & Supply, Tampa Automotive, and Gene Vega Auto Parts & Machine. The Warehouse Distributor Defendants ("W/D's") are Commercial Warehouse, Div. of Thompson Automotive Warehouse, Inc., Parts and Equipment Distributors, Inc., Tampa Brake and Supply, Co., Inc., EMB Brake and Automotive Supply Inc., and United Equipment Sales, Inc. The Manufacturer Defendants ("M/D's") are Bendix Aftermarket Brake Division, Inc., Fel Pro, Inc., Sealed Power Corporation, Federal Mogul Corporation, Gates Rubber Co., Inc., Wagner Div., McGraw–Edison and Arrow Automotive Industries, Inc. All of the M/D's manufacture different prod-

ucts, except that Bendix and Wagner make similar products.

Plaintiffs are automotive parts jobbers who do business in Tampa, Florida. Plaintiffs allege that the Manufacturer Defendants have violated Section 2(a) of the Robinson Patman Act, 15 U.S.C. Sec. 13(a), by selling automotive parts products to Defendant Warehouse Distributors at lower prices than those at which the Manufacturers sell the same products to Plaintiffs, with no cost or competitive justification for the price discrimination.

Plaintiffs also allege that the Manufacturer Defendants have also dealt directly with a minority of preferred jobbers, permitting those jobbers to buy directly from the Manufacturer at the Warehouse Distributor's discount prices, and then to resell at jobber's prices to dealer-consumers. Plaintiffs further allege that the Manufacturer Defendants have knowingly permitted and authorized the Warehouse Distributor Defendants to utilize the Warehouse Distributor's discount in competing with Plaintiffs for Plaintiffs' customers, claiming that this is secondary line and tertiary price discrimination in violation of Section 2(a) of the Robinson Patman Act.

Plaintiffs further allege that the Warehouse Distributor Defendants have violated Section 2(f) of the Robinson Patman Act, 15 U.S.C. Sec. 13(f), by intentionally inducing and causing the price discrimination activities of the Manufacturer Defendants.

By stipulation, the motions for summary judgment are limited to the issue of whether Plaintiffs have purchased products from the Manufacturer Defendants at prices higher than those paid by Plaintiffs' competitors.

15 U.S.C. 13(a) provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchases of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale or delivery resulting from the differing methods or quantities in which such commodities are to such purchases sold or delivered: *Provided, however,* That the Federal Trade Commission may, after due investigation and hearing, to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further,* That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

15 U.S.C. Sec. 13(f) provides:

It shall be unlawful for any person engaged in commerce, in the course of such

commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–7 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. 477 U.S. at 322, 106 S.Ct. at 2552–53 91 L.Ed. at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at p. 324, 106 S.Ct. at p. 2553, 91 L.Ed. at p. 274. The Court is satisfied that no genuine issue remains for resolution at trial.

## I. VIOLATION OF SECTION 2(a)— MANUFACTURER DEFENDANTS

 The basic purpose of Section 2(a) of the Robinson Patman Act is to insure that purchasers from a single seller would not be injured by the seller's discriminatory pricing policies. The complaining party must allege and prove that there were two sales made by the same seller to at least two different purchasers. *Federal Trade Commission v. Morton Salt Co.*, 334 U.S. 37, 45, 68 S.Ct. 822, 827–828, 92 L.Ed. 1196 (1948). A sale to one and a refusal to sell to another will not be deemed "sales" to two or more purchasers at discriminatory prices. *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290 (7th Cir.1974). Where a manufacturer sells to jobbers at one price and to retailers at another price, a retailer who bought from the jobber has no complaint under the Act because he paid a higher price for the same goods than his retailing competitor who bought directly from the manufacturer. He is not the manufacturer's customer. *Klein v. Lionel Corp.*, 237 F.2d 13 (3rd Cir.1956).

 "Purchasers" within the meaning of Section 2(a) does not necessarily mean purchasers buying direct from the seller. *Skinner v. U.S. Steel Corporation*, 233 F.2d 762 (5th Cir.1956). As the Seventh Circuit has stated:

> "If a seller can control the terms upon which a buyer once removed may purchase the seller's product from the seller's immediate buyer, the buyer once removed is for all practical, economic purposes dealing directly with the seller. If the seller controls the sale, he is responsible for the discrimination in the sale price, if there is such discrimination. If the seller cannot in some manner control the sale between his immediate buyer and a buyer once removed, then he has no power by his own action to prevent an injury to competition."

*Purolator Products, Inc. v. F.T.C.*, 352 F.2d 874, 883 (7th Cir.1965). The thrust of this so-called "indirect purchaser" doctrine is that a manufacturer, by utilizing the subterfuge of a "dummy" wholesaler or distributor, should not be able to evade the price discrimination provisions of the Robinson–Patman Act. *Hiram Walker, Inc. v. A & S Tropical*, 407 F.2d 4 (5th Cir.1969).

 Typical cases where the application of the indirect purchaser doctrine has been upheld arise when a retailer buys from a "dummy wholesaler" established either by the buyer or the seller. If the "wholesaler" is owned by the seller, or is a spurious

intermediary organized by the retailer, jobber or a purchasing agent, or is merely a bookkeeping device established by a group of retailers or jobbers, it is not an independent link in the distributive chain and clearly exists solely to support some technical justification or shield for the grant or receipt of an unlawful price benefit. *Unfair Competition,* Callman, Ch. 7, p. 63.

In *Purolator Products, supra,* the F.T.C. used the following standards in arriving at its conclusion that jobbers were purchasers of Purolator products:

"Where the prices to be charged the indirect purchaser are effectively established by the manufacturer, and where virtually all the conditions and terms upon which the sale is to be consummated are fixed by the manufacturer or are subject to its approval, the predicate for a finding that the indirect purchaser is a purchaser from the manufacturer has been constructed. Other factors to be considered in arriving at the conclusion are instances of direct contact between the indirect purchaser and the manufacturer, such as direct negotiation of franchise agreements, direct solicitation of orders by the manufacturer's salesmen even though orders are filled by the intermediary, and the manufacturer looks to the intermediary for payment, direct negotiations of changes in price, direct policing of the indirect purchaser's resale prices, direct provision of advertising materials, and inspection by the manufacturer to insure that the indirect purchaser is fulfilling the terms of its agreement with the manufacturer's distributor or wholesaler."

*Purolator Products,* at 881. In *Purolator,* the Court upheld a finding of an "indirect purchaser" based on evidence that the Manufacturer 1) had at one time the legal right to control independent Warehouse Distributor Sales, 2) had supplied Warehouse Distributors with sale agreements and suggested resale price lists, 3) had solicited indirect purchasers ("Jobbers") and urged them to maintain prices which they, for the most part, had done, and 4) had directly negotiated franchise agreements and changes in price with indirect purchasers. *See, Joseph A. Kaplan and Sons, Inc. v. F.T.C.,* 121 U.S. App.D.C. 1, 347 F.2d 785 (1965); *Checker Motors Corp. v. Chrysler Corp.,* 283 F.Supp. 876, 888, (1968), *cert. den.* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777.

■ The question of whether the indirect purchaser doctrine has a legal basis is a mixed question of law and fact. When the manufacturer lacks sufficient contact with the indirect purchaser and/or sufficient control over the terms upon which he buys, the latter will not qualify as a "purchaser" within the meaning of the act. *Klein v. Lionel Corp.,* 237 F.2d 13 (3rd Cir.1956).

■ Plaintiffs argue that "since the resolution of that issue hinges upon the number and quality of contacts between the Manufacturer and the alleged indirect purchaser, it must await trial." *K.S. Corp. v. Chemstrand Corp.,* 198 F.Supp. 310, 313 (S.D.N.Y.1961). *Chemstrand* was decided on a motion to dismiss. This Court does not read *Chemstrand* to require a trial, as long as the facts are sufficiently developed by discovery to allow the Court to decide if there is a genuine factual issue to be resolved. In this case, the Defendants have brought forth uncontroverted evidence which establishes that there is no sharp issue as to control.

In *Barnosky Oils, Inc. v. Union Oil Company of California,* 665 F.2d 74, 84 (6th Cir.1980), the Court said that the invocation of the indirect purchaser doctrine normally raises a factual issue not properly resolved prior to trial. However, in *Hiram Walker v. A & S Tropical, Inc.,* 407 F.2d 4 (5th Cir.), *cert. denied,* 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969), the Fifth Circuit reversed the district court's denial of summary judgment for a beverage manufacturer defendant where the manufacturer, who sold beverages to wholesale distributors, did not fix the distributors' resale price to retailers. In *Hiram Walker,* the Court relied on the following evidence:

In his deposition submitted on the motion for summary judgment, William G. Benjamin, Sr., President and sole stockholder of plaintiff, admitted that he did not know of a single instance in which Hiram

Walker sold directly to any retailer. Furthermore, Binford H. Sykes, General Manager of South Florida, and Elliott Feinberg, President of Florida Beverage, [wholesale distributors] stated in their depositions that prices were set entirely by their own companies and without consultation with Hiram Walker. There was no evidence to the contrary and the facts were undisputed. Under these circumstances, appellant Hiram Walker cannot be held liable as a seller within the meaning of the Robinson–Patman Act. [407 F.2d at 8].

A. ADMISSION OF NO DIRECT SALES FROM MANUFACTURER TO JOBBER

■ Plaintiffs concede that they do not buy direct from the Manufacturer Defendants. There was no evidence to the contrary and the facts are undisputed. Plaintiffs seek to have this Court compel the Manufacturer Defendants to sell directly to them. The application of *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) prevents that result. Plaintiffs have not offered any evidence of joint action by the Defendants, or evidence of any affirmative agreement among the members of the group not to deal with the Plaintiffs. "[The] right to refuse to deal, the statutory embodiment of the 'Colgate Doctrine' permeates the entire Robinson Patman Act. One who is not a customer cannot claim the allowance or services which flow from Sections 2(d) and (e)." D. Baum, *The Robinson–Patman Act: Summary and Comment*, p. 53 (1964). *See also, Naifeh v. Ronson Art Metal Works*, 218 F.2d 202, 206–7 (10th Cir.1954). The Manufacturer Defendants are free to choose their customers in bona fide transactions according to the terms of the Act.

Plaintiff has cited *Mueller v. Federal Trade Commission*, 323 F.2d 44 (7th Cir. 1963) to argue that Defendants are illegally using the functional discount to injure competition. However, that case is distinguishable. *Mueller* held that the extension of a 25% discount to a "stocking jobber" while giving only a 15% discount to a "regular" jobber might be substantial enough to injure competition. The Court also found that there were no objective standards to guide the regular jobbers in qualifying as acceptable, and that the Petitioner's decisions to extend the additional discount were based on favoritism rather than objective standards.

The Court is not persuaded that there is an open issue in this case as to what standards the M/D's use to take on a W/D as a customer. Plaintiffs have demonstrated on deposition their knowledge of what a W/D is, and the key requirement of the ability to maintain certain inventory levels and required breadth of product line. Plaintiffs have admitted their inability to maintain such inventory levels and wide variety of products.

To have a viable 2(a) claim under the Act, Plaintiffs must prove two sales to two different customers. If this threshold is not met, the Court's consideration of the "qualification" issue is misplaced. In the case now before the Court, the same discount is available to all Warehouse Distributors who purchase from the Manufacturer Defendants. The Manufacturers do not sell direct to Plaintiffs. Therefore, the issue becomes whether the Manufacturer Defendants own or control the Warehouse Distributor Defendants, so that the "indirect purchaser" doctrine comes into play.

B. TERMS OF SALE FIXED BY MANUFACTURER OR SUBJECT TO ITS APPROVAL; DIRECT POLICING OF RESALE PRICES; INSPECTION BY MANUFACTURER TO DETERMINE IF INDIRECT PURCHASER IS FULFILLING THE TERMS OF ITS AGREEMENT WITH DISTRIBUTOR; RIGHT TO AUDIT

■ There is uncontroverted testimony that the W/D's are independently-owned businesses. Plaintiffs admit no knowledge that the M/D's own the W/D's, and Defendants have offered affidavits establishing no common ownership. Plaintiffs have raised the issue of control, citing the agreements which the M/D's have the W/D's sign upon becoming customers.

The subject sales contracts contain various provisions. The provisions typically include:

1. W/D will allow the M/D to audit W/D's invoices to determine if sales were made to customers, and W/D agrees to maintain supporting information, or furnish monthly sales reports.
2. W/D agrees to confine his business to jobbers who will not be users of the product but will further distribute it or to fleet customers with whom the M/D has a contract.
3. Purchases shall be billed at distributor net price less a percentage.

In *Windy City Circulating Co. v. Charles Levy Circulating Co.*, 550 F.Supp. 960, 966 (N.D.Ill.1982), the Court granted summary judgment for defendants and refused to apply the indirect purchaser doctrine in the following circumstances:

The plaintiffs purchased products, not from national distributors, but from national distributors' wholesalers; in this case, Levy. While there is evidence to suggest that at least some of the national distributors require Levy to provide information concerning draw, return and net sales for accounts served, there is nothing to suggest, much less establish, that these defendants control the price Levy charges the plaintiffs for magazines and paperback books. Indeed, the plaintiffs' theory falls in the wake of uncontroverted affidavits filed by several of the defendants swearing that their respective companies do not control Levy's resale prices and terms of sale.

In the case now before the Court, there are, in some instances, contracts which purport to control the behavior of the parties, and, in some instances, there are no contracts. Not every contract contains the same provisions. Defendants uniformly deny that the contracts control their behavior. Defendants testify that if a Warehouse Distributor refuses to sign a contract, there are no consequences, and the W/D is nevertheless accepted as a customer. Some Manufacturer Defendants have had contracts in the past that are now superseded, and new contracts have later been signed, and, in some instances, have not been signed. The sales contracts provide that the contracts are binding, but all Defendants testify that the sales contracts are never enforced.

■ Plaintiffs seek to have this Court find that the Manufacturer Defendants control the setting of price by the Warehouse Distributor Defendants. Plaintiffs want this Court to compel the Manufacturer Defendants to enforce their sales contract as to the provision that the WD's will sell only to jobbers, and not to Plaintiffs' customers. Plaintiffs implicitly admit that the behavior of the parties is at odds with the written agreements, and the sales contracts are not now enforced. This indicates to the Court that the M/D's do not control the behavior of the W/D's, so as to satisfy the requirements of the "indirect purchaser" doctrine.

The essence of a contract is the understanding between the parties, not the written memorial of that understanding. Defendants have provided uncontroverted affidavits and testimony that the sales contracts are only pieces of paper, and no action is ever taken by the Manufacturer Defendants to require the "contracts" to be honored, if the Warehouse Distributors do not adhere to their provisions. The Court does wonder what function is served by the sales contracts, but will not speculate in the face of uncontroverted evidence that no Defendant has ever taken steps to enforce the written agreements, that in some cases there are no written contracts, and there are no consequences if a Warehouse Distributor refuses to sign a sales contract. This Court will not address the issue of whether the sales contracts are binding documents. This Court is only considering the narrow issue of the threshold requirement for a 2(a) claim, two sales to two different purchasers. The uncontroverted evidence before the Court is that the M/D's do not have actual control over the behavior of the W/D's pursuant to the sales contracts.

## C. PRICE SHEETS

■ Plaintiffs allege that because Manufacturer Defendants publish price sheets, the Manufacturer Defendants are setting the price which the Warehouse Defendants charge Plaintiffs. Plaintiffs have further argued that to be competitive with other companies selling the same part, who have set their prices using suggested price sheets, the sellers *must* abide by the price sheets. Defendants respond that the price sheets are provided only as a convenience in pricing the hundreds or thousands of parts that each Warehouse Distributor sells, because calculating the selling price of each part would be prohibitively time-consuming.

The Manufacturers charge Warehouse Distributors what it costs to produce the product, plus a profit margin, taking into account competition and other relevant factors. In *Susser v. Carvel Corporation,* 332 F.2d 505, 510 (2d Cir.), *cert. granted,* 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), *cert. dismissed as improvidently granted,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965), [the Court] held that an ice cream manufacturer's practice of recommending a retail price to its franchised dealers was lawful where "the franchise provisions explicitly reserved to the individual dealer the right to set whatever price he desired" and where no attempts to enforce the price structure were shown. In the case now before the Court, the Warehouse Distributors have filed affidavits attesting to their freedom to set their own prices. On deposition, those Defendants have testified that some products are priced higher than the suggested price, and some are priced lower. Some Defendants use the price sheets for every product, and some do not use the price sheets at all, using a computer program to set prices instead. Plaintiffs have not brought forth any evidence to establish that the Warehouse Distributors are in any way coerced into using the price sheets provided by the Manufacturer Defendants.

The suggested price sheets are provided as a convenience to the Warehouse Distributors, and are a "floor", that is, provide a suggested minimum price level that the Warehouse Distributors *could* use in setting price. *See, FLM Collision Parts v. Ford Motor Company,* 543 F.2d 1019, 1028 (2d Cir.1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). To equate this with control "would reach the absurd result of extending the [indirect purchaser] doctrine to cover every resale of goods." *Id.*

■ The Warehouse Distributor Defendants are free to set their prices at whatever level they choose. The only constraint is economic reality. There is no proof of any coercion by the Manufacturer Defendants which causes the Warehouse Distributor Defendants to choose a certain price level. The marketplace sets the price. Plaintiffs seek to hold the Manufacturer Defendants personally responsible for an economic reality. The products have a certain cost to produce, and the Manufacturers price them to include a profit as well as cover their costs. If the Manufacturers did not provide price sheets, the underlying economic reality of the costs to produce, and the desired profit margin, would not be any different. The only difference would be one of the information, so that instead of Plaintiffs and W/D's having access to price information from the M/D's, both would be operating in the dark, until enough time had passed for each to independently develop his own price information.

Plaintiffs have complained that the Manufacturer Defendants are responsible for knowingly allowing the Warehouse Defendants to sell products at less than suggested jobber prices, and for not taking any steps to prevent this practice. (Vega Deposition, p. 74; Daniels Deposition, p. 264). Plaintiffs testify that the price sheets are an industry standard, and if prices are not set in accordance with the sheets, Plaintiffs will lose business by failing to offer competitive prices. Plaintiffs want the Court to force the Manufacturers to control the prices set by Warehouse Distributors, and/or to control the customers to which the W/D's sell. In other words, Plaintiffs want this Court to endorse resale price

maintenance. This Court declines to do so. Further, in seeking this relief, Plaintiffs implicitly admit that the Manufacturer Defendants do not in fact control the prices set by the Warehouse Defendants, so that the attempt to invoke the indirect purchaser doctrine is not appropriate in this case. Plaintiffs have admitted on deposition that Warehouse Distributors could set prices at any level they want, and that there is no punishment for not using the price sheets. There is no evidence that a Manufacturer has refused to retain a W/D as a customer when the W/D did not use the price sheets, or has coerced the W/D's in any way.

■ Alternatively, Plaintiffs seek to have this Court take away the advantage of the functional discount that is offered by the Manufacturer Defendants to the Warehouse Distributor Defendants who stock their products by eliminating the discount. Plaintiffs admit that because of their size, they cannot afford to stock the volume of inventory or broader product lines that the Warehouse Distributors can handle. This Court recognizes the specialized needs of the automotive parts industry, where the necessity for providing car dealers, gas stations and garages with thousands of repair parts on a day-to-day basis has resulted in a complex pattern of distribution and pricing. Section 2(a) of the Act provides that nothing contained therein "... shall prevent differentials which make only due allowance for differences in the costs of manufacture, sale or delivery resulting from the differing methods or quantities in which such commodities are to such purchases sold or delivered ..." *See also, Alhambra Motor Parts v. Federal Trade Commission,* 309 F.2d 213 (9th Cir.1962). The Warehouse Distributor Defendants are providing a bona fide service to the Manufacturer Defendants, which the Plaintiffs admit they cannot provide. If Plaintiffs do not provide the service, they cannot receive the benefit of the discount.

■ Alternatively, Plaintiffs seek to have this Court order the Warehouse Distributor Defendants to pass the functional discount they receive on to their customers.

This is another form of resale price maintenance, which this Court declines to allow.

D. **DIRECT SOLICITATION OF ORDERS; DIRECT PROVISION OF ADVERTISING MATERIALS; DIRECT NEGOTIATION OF PRICE CHANGES**

■ Defendants have testified that there is some direct contact by their field representatives in the form of general promotion of their product lines, communicating new improvements, answering questions, working with a customer to solve a problem, suggesting inventory adjustments, advising of new part numbers, announcing new programs, and occasional educational clinics. These contacts enhance the overall market position of the Manufacturer Defendants on a regional level. These contacts do not establish that the Manufacturer Defendants control the resale of their products. *Hiram Walker v. A & S Tropical, Inc.,* 407 F.2d 4, 7 (5th Cir.1969), *cert. denied,* 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969).

■ Plaintiff has argued that the Manufacturer Defendants do take purchase orders directly from jobbers. Harold Daniels testified on deposition that manufacturer representatives from the various companies visit about once a year and seek orders for merchandise (p. 246). Daniels testified that one Manufacturer Defendant shipped a product directly to him in the case of a changeover, but that there were no shipments on a regular basis (p. 258–259). Daniels further testified that the Manufacturer Defendants sell direct to him only through their representatives, the Warehouse Distributors. (p. 252). The Court is not persuaded that the regular practice of the Manufacturer Defendants is to take orders directly from the Plaintiffs, on the basis of the above testimony. Apart from an isolated "problem" situation, for example, the "changeover" involving direct shipment, the efforts of the Manufacturer Defendants are confined to general promotional activities, designed to increase the market for their products as a whole, rather than to solicit individual orders.

■ Plaintiffs further cite the deposition of Bernard Ross, at pages 8, 9, 12 through 16, in which Mr. Ross states that the field representatives contact customers to promote and sell Wagner products through the customers of Wagner, that is, through the Warehouse Distributors. The Court finds that the testimony only establishes that the selling activities are designed to encourage the prospective customer to seek out that particular product line at the Warehouse Distributors, not to arrange an individual sale transaction direct from Manufacturer to jobber.

Plaintiffs have brought forth no evidence that the M/D's directly participate in negotiation of price changes between the W/D's and Plaintiffs, nor that the field representatives of the M/D's direct the Plaintiffs to buy from a particular W/D.

Based on the foregoing, the Court concludes that Plaintiffs have not established the threshold requirement of a 2(a) claim, two sales to two purchasers. Plaintiffs have conceded there are no direct sales, and Plaintiff's attempt to invoke the indirect purchaser doctrine is not appropriate in this case. There is uncontroverted evidence that the Manufacturer Defendants do not control the price, terms or manner of the W/D's' sales, nor do the Manufacturers own the Warehouse Distributors. There is no "dummy" entity or spurious intermediary involved in the subject transactions. The Court grants summary judgment to the Manufacturer Defendants on this issue.

## II. VIOLATION OF SECTION 2(f)— WAREHOUSE DISTRIBUTOR DEFENDANTS

■ A buyer who receives a price differential cannot be liable under the Robinson Patman Act unless the seller is in violation of the Act as well. *Great Atlantic & Pacific Tea Co. v. F.T.C.*, 440 U.S. 69, 75–78, 99 S.Ct. 925, 930–31, 59 L.Ed.2d 153 (1979). As discussed above, Plaintiffs have failed to meet the threshold to establish seller liability. The Court finds there is no buyer liability under 2(f) for knowingly inducing or receiving an illegal price discrimination. Summary judgment is granted to the Warehouse Distributor Defendants on this issue. Accordingly, it is

ORDERED that Plaintiffs' motion for partial summary judgment is denied, and the request for oral argument is denied; it is further

ORDERED that Manufacturer Defendants' motion for summary judgment is granted. It is further

ORDERED that Warehouse Distributor Defendants' motion for summary judgment is granted. It is further

ORDERED that all claims under Florida law are remanded for proceedings in State Court; it is further

ORDERED that the Clerk is directed to enter final judgment in favor of Defendants in final dismissal of this case.